Case No. 15-1038, et al., AT&T, Inc. Petitioner v. Federal Communications Commission, et al. Mr. Sofnes for the petitioner, Mr. Dunn for the respondent. Thank you, Chief Judge Garland, and may it please the Court. Benjamin Sofnes for the petitioners, and I'd like, if I might, to reserve four minutes for rebuttal. In 2011, the FCC finally began replacing the system of implicit universal service subsidies with the explicit subsidies that the 1996 Act requires. Since the adoption of that 2011 order, the FCC has repeatedly promised to allow the incumbent ETCs subject to the pre-2011 regime and not just newly designated ETCs under the new system to tailor their service areas and obligations to the areas where they actually receive that explicit support. Yet six years later, all the FCC has said in order after order is maybe next year. In the meantime, the incumbent carriers are obligated with statewide obligations to cost more than $1.5 billion a year and that provide no meaningful protections to telephone customers. The FCC's refusal to match the obligations to funding violates both the 1996 Act and the APA, and because the APA is the narrower of the two grounds on which we seek relief, pardon me, I'd like, if I might, to start there. Every universal service decision has to be based on the principles set forth in 47 U.S.C. section 254B. When the FCC decided not to align funding with obligations, it left the incumbent carriers with obligations in hundreds of thousands of census blocks where it acknowledges there's likely no business case to provide service absent support, and it provides no support for that. It purported to base that decision on three of the section 254 principles, access for consumers, the sufficiency of support, and competitive neutrality. The FCC erred as to each of those principles. On access, the record didn't have any evidence that allowed the FCC to conclude that there was a threat to access, and I can walk through exactly the relief the petitioners have sought from the agency. Isn't that contradicted by what you just said when you said that there was no business case for providing service in those census tracts? No, Your Honor, because for two reasons. First of all, what the record showed is that in every one of those census blocks, in every one of those census blocks that AT&T observed, there's at least three other providers providing lifeline service, and so there's competitive carriers providing service in those census blocks, and moreover, the second point is the 47 U.S.C. section 214A discontinuous process exists to catch any census blocks where there might be a gap. But lifeline is a separate program that's really, I guess, really only provides service to a narrow range of consumers, right? Yes, Your Honor, but a lifeline provider isn't necessarily a provider that offers only lifeline, but even separate from that, the record showed again that in the 385,000, in the high-cost census blocks that AT&T observed, it was never the case that it was the only carrier providing service. Is that the language where you use the language wire centers? Yes, Your Honor. So the government says a wire center is not the same as a census block. Did AT&T make a submission that actually used the words in every single census block or only in every wire center? Its submission was on the wire center level, Your Honor. So what's unreasonable about the FCC saying that doesn't meet the burden? You have to show that it's in census blocks if your argument is that it's in census blocks. Well, two points, Your Honor. First, though it isn't in the record, AT&T has had the chance further to look and has yet to discover even at the census block level. Was that submitted to the FCC before its decision? That wasn't, Your Honor. Okay, well then that doesn't work, right? And when you say AT&T has yet to discover, it seems like there's a question about who has the burden, and the government is saying we had a system in place that was in place in part to cover any potential gaps. We don't want to remove that system unless and until we're satisfied that all those gaps are covered. So there's, you know, they're not wanting to be casual unless they have census block complete data. And they're not quite there on this record. Isn't that the case? It is the case that there was not census block by census block data showing that every single one had service. However, I think it's important to be clear here, the burden is on the FCC. The FCC undertook a rulemaking docket starting with the 2011 transformation order. They identified this mismatch. They solicited comments. They solicited comments again in 2014. They even asked that the record be refreshed since then, and they had nothing in the record. Why do you say the burdens? You began with the discussion of the APA. Yes, Your Honor. And the only burden here is substantial evidence, which doesn't require them to show that there's nothing in every census block. It only requires them to show it's reasonable on the record before them that they didn't have enough evidence that there was something in every census block. Do you think there's something in the law that requires them, the FCC, to put evidence in that there's census blocks that are not covered? I do, Your Honor. I think the APA requires, as you say, the agency to base its decision on substantial evidence. And certainly where there is conflicting evidence that permits, you know, a number of reasonable conclusions, an agency likely gets deference to select one of them. But where the only evidence in the record suggests complete coverage, the FCC is not empowered to do so. But the evidence doesn't suggest complete coverage. You told me that wire centers doesn't mean census blocks. Let me ask another question. That evidence is only about AT&T, right? Correct. The forbearance petition was filed by? By U.S. Telecom. Is there evidence by U.S. Telecom in here? U.S. Telecom submitted broader evidence nationwide showing that there's coverage. But not census block by census block? No, Your Honor. Not census block by census block. And your evidence about wire centers doesn't apply to anybody other than AT&T? That's correct. But, again, it's the only evidence in the record. The FCC pointed to no evidence in the record suggesting that it identified any place where there was a coverage gap. And I think that's important for two reasons. One, as I said, I do believe the law under the APA is the agency has to substantiate its decision with some record evidence. Its decision is it doesn't want to risk not having coverage, particularly in rural and underserved areas. That's its reason. It doesn't want to risk it. It puts the burden of the risk. Since it has a statutory obligation to ensure universal service, it wants to be sure that it's able to ensure universal service. And I would submit that it didn't meet its burden to do that because it didn't identify any area where there was a risk. And I would make two other points on that. The FCC has acknowledged, this is from a 2010 universal service order, that, quote, even in rural areas approximately 98.5% of the population has access to mobile services offered by one or more providers. And more to the point. What happens to the other 1.5%? Well, the other 1.5% can readily be covered by the Section 214a discontinuance process, and I think that's a critical point here. Access, though, and access to mobile service means that if they wanted to subscribe and get a smartphone, they could do that. But it doesn't mean that they're actually signed up. I'm just thinking of elders in remote areas, and I don't know about your relatives, but a lot of mine are still pre-mobile. So they may have an opportunity to get that, but that doesn't necessarily mean they're signed up, right? I don't know on that point, Your Honor. You don't know about her relatives. That's right. I do know about my own. What I do think is I don't think there's any dispute here that wireless is a reasonable alternative for wireline, particularly when it's available at a reasonably comparable rate, as the statute requires. And that's what Section 214a provides. I mean, this is what the FCC said in its 2014 order. It said, through a consideration of the Section 214a factors, and I'm quoting here from page 2046 of the appendix, the commission ensures that the removal of a choice from the marketplace occurs in a manner that respects consumer expectations and needs, and that it will not authorize a proposed discontinuance of service if customers or other end users would be unable to receive service or a reasonable alternative. So in the event that there are coverage gaps, which, again, the FCC didn't substantiate with record evidence of its own, but in the event that there are coverage gaps, they're going to be the minority, and the Section 214a discontinuance process exists precisely to cover that. And so I think that's something that can't be overlooked here. What the FCC did was really take a sledgehammer to crack a nut. It said, well, there are these 385,000 census blocks, and there's this statewide lifeline obligation, and because there may be an instance in a few of those high-cost blocks where the ETC may be the last carrier providing service, that we're going to require service to be maintained everywhere. That's not a rational approach. What do you make of the you don't say much about the FCC's insistence that if there is actually a great financial burden or an untenable burden on the carriers, that they are willing to look at case-by-case forbearance and or willing to provide funding where the shortfall has been shown? And I don't know what your position is on that. Why wouldn't that be a reasonable way to proceed? They're conceding that, yes, there may in fact be some situations in which this is an unnecessary service and or where it is necessary that it's too much of a burden on the carriers. What makes that not a reasonable stopgap? I know it's not your preferred position, but what makes that, you know, under the arbitrary and capricious review, not a reasonable safeguard? Sure. Judge Pillard, I think there's two things that make that unreasonable. First is, of course, the fact that there's a safety valve or an opportunity for exceptional relief doesn't permit the agency to use an unreasonable approach, you know, more broadly. It doesn't justify an unlawful approach. But second of all, we know from the order and from the FCC's brief how that safety valve will work. It says in footnote 440 of its order where it addresses that exceptional relief that it will be provided if the carrier is unable to provide service. And at page 55 of its brief, it explains that unable is where it says, well, we have no obligation to ensure there's a business case. It's just a matter of if this service as a whole is sufficient, that's the test they want to apply. That's absolutely not the test because that relies on implicit subsidies. So to say, well, you're able to survive despite the fact that we know by Chairman Pai's own estimate that you're operating at a billion dollar loss. But the fact that you're able to stay in business, perhaps because of profitable service elsewhere, means we don't have to give that support until you say you're unable. That's an implicit subsidy, and that's exactly what section 254E of this statute. This is on the word sufficiency we're talking about? I'm sorry. You're basing this on sufficiency? What language in the statute? What word in the statute? I'm looking at 47 U.S.C. section 254E, which is at page 9 of the statutory addendum. And which words are you talking about? The ones about the one that suggests that you have to have more than just enough to stay in business. What language would you rely on? I'm looking at the last two sentences of section 254E, Your Honor. And what we learned from – I'll start with the last sentence. What we learned first is that support should be explicit. So I'm looking at the explicit language as well as the sufficiency. Support should be explicit and sufficient to achieve the purposes of this section. So sufficient, right? Explicit as well, Your Honor. Support should be explicit. Well, we know exactly what the support is, and it should be sufficient. But hasn't this court already described what sufficiency means in our decision in rural cellular? Yes, but rural cellular – to an extent, rural cellular – Let me just read you the language, and then you tell me why it doesn't fit here. Petitioners include no-cost data showing that they would, in fact, have to leave customers without service as a result of the cap and therefore give us no valid reason to believe the principle of sufficiency, even viewed in isolation, will be violated by the cap. That's our own court, not the 10th Circuit, deciding that sufficiency just means you have to have enough money to make sure that the service is able to be provided. And I think, Your Honor, I take the point. But under the – two points. First, that was not a holding that support that is $0 can be sufficient, and that's what we have here. In the 2011 transformation order, the FCC switched to a census block-by-census block approach. But I agree with you. It doesn't say $0 is enough, but it says you have to show that it would leave customers without service as a result of the cap. Have you shown that that would happen? Which, in other words, you are unable to provide the service. And maybe it's because you go out of business otherwise, or maybe it's because you lose too much money overall otherwise, or some other reason. But that seems to be the standard that our court adopted in 2009.  First, again, that was not – I would say the facts are certainly distinguishable where it's not a holding saying support can be $0. But the second point that I think is critical is in Section 254E, there's also the requirement that service be – pardon me, that support be explicit. And I would push back, if I might, on the suggestion that explicit only means they said where it's going. What explicit means is a direct reference to the prior system of subsidies, which were implicit, which were based on the notion that the fact that you provide profitable service in one place or in one form of your business can justifiably be used to require you to provide service that's money losing somewhere else. And that's the system that the Congress required the FCC to replace, and that's what courts have held that have analyzed that statute. So when we say explicit, it has to be – it has to be identified as to what it's supporting. And that's backed up by the penultimate sentence of Section 254E, which says that a carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. If I may continue to answer. What that means is that if you're taking support that's being used – that's being given to the carrier to do something else – I mean, the FCC refers in its brief to Lifeline as being used to justify providing high-cost service. You're taking that support and using it for something other than – and I'm quoting the statute – for which the support is intended. And that's why that doesn't work. So, Mr. Zeldin – I'm sorry, were you – I was. You got a chance to finish your sentence. You know, if you look at this from the commission's position there and sort of zero out a little or zoom out a little bit, they are undergoing a transition that I take it you think is an improvement, and they are focusing on getting the broadband services up, getting into the Phase 2, and holding things steady with respect to these services in the meantime, and providing the frozen same level of support. I take it that the premise of your position is that from the beginning that approach was unlawful and or arbitrary and capricious. That approach of under the – you know, once we have the 96 Act in place, these service areas, including some places where providing the service wasn't fully subsidized. Is that right? Is that your position? I mean, it – Judge Phillip, I'm not sure we need to take a position on exactly – let me put it this way. Let me do a waffle here. What we're challenging is the agency's rulemaking decision. And it may well be that any time support was unmatched that that violated the statute and that that was an arbitrary and capricious approach. But here, of course, the agency has consummated a rulemaking decision and provided a final order, and that's what we're challenging, and that's the decision we're getting at. But to the extent that the premise of that is we're going to hold what was the coverage rationale and scheme steady with respect to, albeit a radically diminishing pool of hard-to-serve customers, while we ramp up into a better, more efficient, more nuanced regime, I guess another way of asking my question is, is there something about the actions in anticipation of Phase 2 that has exacerbated, in your view, the unfairness or arbitrariness to the couriers? Is there something about the census blocks you're left with that makes this more substantively unfair or more of a problem? I would say, yes, I'd say primarily the development of the factual record and the identification or the realization that this really has become an absolutely unnecessary requirement. Again, with the fact that as to Lifeline, with the service area designation, there's at least three other Lifeline providers in every wire center, and that as to the high-cost census blocks, they've identified, A, no blocks where there isn't going to be service and where the Section 214a discontinuance process applies. Having realized that, and I would say the extent of the delay. So at the outset, the FCC set out a framework. This is the 2011 order. It then identifies the mismatch, solicits rulemaking on what to do, and it may well be that at that moment they had to have fixed it, but they proposed a way to fix it, and we provided comments to that point. I think another part that exacerbates it is the continuing delay, the continuing, we're not going to do it yet, we might do it next time. Although now it's been announced that there's going to be auction in 2018, and is that, once that takes place, will there still be a residual problem here? There will. And two points on that, Your Honor. Of course, the auction was first announced for late 2012. So we know it's been announced for 2018, but of course, to some extent, respectfully to the agency, we've heard this before. But the second point is that the auction won't fully complete the job. At a minimum, there are high-cost blocks and there are so-called extremely high-cost blocks, and the extremely high-cost blocks where we likewise have unfunded high-cost obligations that, again, the FCC's chairman estimates at a billion-dollar loss. Those won't be funded by the Phase 2 auction. That will be a follow-up auction that has yet to be scheduled called the Remote Areas Fund auction. And from the perspective of AT&T, it's three states in which you have this obligation? No, I think it's about 14 states. I'm sorry, for the extremely high-cost specifically? I thought there were only three states where AT&T was the existing eligible provider and decided not to step up and take the deal for Phase 2 and has therefore left it. I mean, those are the letters, the ex parte letters. No, that's correct, Your Honor. I'm sorry. So it's three states, I thought, right? No, because even in the states where AT&T took the Phase 2 money, the extremely high-cost census blocks are still left without funding. But that's a separate question. I thought the question in this petition is about those that are not accepted into the Phase 2 process, but those that are left over. No, Your Honor. This case is about any of the high-cost census blocks where there currently is no high-cost funding. So that would apply to, in states where AT&T accepted the Phase 2 money, that would apply to the extremely high-cost census blocks where there isn't Phase 2 money. And in the states where it did not, that would apply to any of the Phase 2 blocks that remain unfunded. One thing I'd like to circle back to, if I might, is just to say we're out of time. Okay. Unless the Court has any more questions. Actually, we're five minutes over in case anybody has no questions. Thank you, Judge. Chief Judge. We'll hear from the FCC. Good morning, Your Honor. It's Matthew Dunn for the FCC. Just picking up, I think, on a sort of high-level summary that Judge Pillard was, I think, undertaking. The FCC is in the middle of a transition. This whole program is going to drive broadband out to a lot of areas that need it. Right now, we're in the middle of the transition, and the agency is protecting consumers during this transitional period. I would just quickly talk about how to frame this transitional period. I wouldn't date it from 2011, as my colleague has. I would instead date it from 2015. That's the first time that anyone had to opt. The carriers had to opt between what mode of funding they were going to accept, where they were going to accept model-based funding, and where they wouldn't. So that's the first time that, until 2015, the status quo was frozen in place. And now the agency has, as I believe it was Judge Pillard said, scheduled the auction or promised to have the auction in 2018. Chairman Pai has said mid-2018, so that flushes it out a little bit. Just so we can make sure we kind of understand the facts here, once that happens, it's correct that there will probably be some areas that are still not served, that won't go in the auction, that no carrier will bid to take at that price available. That's the vanishingly few in your brief? Because it's a multi-stage, I wouldn't even characterize yet those as vanishingly few, because then we have the remote areas fund auction, and that's scheduled to take place, the agency said, about a year later. So right now we're talking about 6% of the census blocks. We get down to about 1% of the customers served after the Phase II auction for the remote areas fund. And then there may be, and we have a footnote about this, a tiny handful of blocks that are still unfunded then, and the agency has promised in the 2015 order to revisit when this process is finished to square up obligations and support. And in the meantime, can you say a little bit more about the process or the opportunity that you referred to, and I think it was footnote 440, about if there is some kind of untenable or unfair bill on the carriers, what would they have to show in order to be eligible for that? The order doesn't get into the specifics of what they would have to show. I noticed. Yes. I can say that Judge Garland is exactly right that what this court has said, I think this is on the sufficiency point, what this court has said sufficiency means is unable to provide service. What AT&T had done so far was to provide estimates based on an outdated model of costs to serve and estimates of revenue. It's not just that it's outdated. Isn't it also that the model that they were using was a broadband-inclusive model? And I take it that part of the commission's position here is that these legacy carriers have landline technology infrastructure in place and are therefore in the position of the least cost provider. That's exactly right, and I think there's some support for that in footnote 365 of the order. What about opposing counsel's argument that you had some burden to show that there were unserved areas, that they provided evidence, the wire centers are all covered, more general evidence nationwide. Why didn't you have some burden to show that there would be unserved areas before imposing on them the requirement to continue providing service? Right. I think it has something to do with a statutory scheme, or I think it would have to do with that. Sorry, I was going to say I would anchor that in the statutory scheme, which is that the statute contemplates an ETC to serve everywhere. And so the agency, before it relieves carriers of an obligation, needs assurance that customers will be served everywhere. The agency, of course, is regulating with some uncertainty. But now you've capped how much. It's one thing to say that during a period where you're adjusting how much you provide. Here you've capped them. It seems like it puts a different situation here than there was before, and maybe a different obligation on the agency to at least give better explanation, some explanation of why to insist on their maintaining service across the board. Right. So one thing that the agency also pointed to is that a carrier can be relieved by a state of its, it can relinquish its ETC designation if it can show that there is, in fact, another carrier. So in this rulemaking and in the forbearance petition, the carriers were looking to be relieved nationwide of this obligation to serve where there's no support. And the agency said, well, we're not confident, given the data before us, to provide that broad relief. But remember that you can do that specifically in any area where you can make that showing. The carriers just haven't done that yet. Can you just pin down for us your position about the preclusive effect of the 10th Circus opinion and the multi-district litigation and what in particular you think the petitioners are foreclosed from arguing here? I think we haven't meant to characterize them as foreclosed from arguing. We haven't said it's law of the case, for example. I think that it's just persuasive evidence of the meaning of the statute. And this Court's own rulings in the rural cellular cases might be even more persuasive in that way. So I don't want to over-argue the 10th Circuit point, I guess I would say. Well, what about the 10th Circuit's point about the meaning of eligibility and receipt? Is that not preclusive or is that? So the precise matching of obligations and support issue here is actually, as they correctly point out, is not the exact same matching of support that was at issue in the 10th Circuit. So that's why I say that. But the statutory holding seems like it goes to the exact same issue, eligibility versus actual receipt of support. I think that that's right. So maybe I would characterize it this way, that that, like the RCA decisions, is persuasive evidence of the meaning of the statute. The precise application of the meaning to the agency's action here, I wouldn't say is decided by the 10th Circuit.  Okay. And can you replay for us your position on deference? If you're entitled to ordinary deference, but because this is an interim rule, are you seeking greater deference and in what respect? I think this Court and others have said that agencies are owed some extra level of deference. I don't know how one would calibrate that in setting out in place an interim scheme. Why is that in your view? What's the logic of that that applies here?  Well, you know, I mean, we didn't have this colloquy, but his characterization of the legal posture here is that we have a prior scheme. The facts on the ground are changing. He doesn't even accept that the prior scheme was necessarily itself consistent with the statute. One way of understanding the extra deference for an interim situation is that we're holding over something that was in place. As a factual matter was working, even if it hadn't been legally blessed. A different way of understanding it, and there are aspects of this in some of our case law, is that where there's some kind of exigency, there's more deference, and it's only going to be a short time. So, you know, we look at fuzzy data, for example, with a less jaundiced eye where there's exigency. And I just wasn't sure whether it's the exigency of the potentially unserved customers or the fact that there's something that is familiar and been in place and sun setting, you know, and or do you just not need the extra deference and so you're not particularly attentive to it? I think it's the case that we don't need the extra deference. The statutory question here, I'm not sure if their position is it's a Chevron step one or two case, but I think on either grounds, I think we're fine with the statute. And on arbitrary and capricious, you know, do we accept even more uncertainty? Well, of course, the agency didn't speak to this because the agency doesn't opine in its own order about what's owed. So it's really, I guess, up to this court to decide. It would be my personal reading of the law. I'm not sure if I could choose both of those grounds for additional deference, I would do so. And I think there's some logic here. It is, in fact, the case that the status quo to some extent is being kept in place. These guys already have their networks and we're asking them to continue to serve. And it's also the case that it's only in place for a short period of time and it's a stopgap measure to solve the problem of protecting these consumers during this window. No other questions? And what about the extreme high cost? So just factually, what's the... I mean, I guess factually and just kind of how do you justify putting off relief so long for those areas? So it's a very small portion of the census block served. I think it made sense for the agency to take care of, to do this in two tranches, as it were. The high cost areas are areas that the model predicts could be served with some support. The very high cost areas, it seems like the agency took positions in 2011. It probably doesn't make sense to use the same model. Maybe these guys have to, those customers have to be served by wireless carriers, wireless ISP carriers through a different mechanism. So because it was a different technology and different underlying assumptions, it made sense to sort of sequester them from the model so that you could allocate the money to high cost areas and then separately deal with the problem of the very high cost. And then the agency is just taking this sequentially, dealing with the biggest tranche first, and the very high cost will follow, it said, about a year later. That's the logic for why they're dealt with separately. All right, thank you. Thank you. I expect there's no more time left for Mr. Softness. However, your opposing counsel has kindly not used all of his time, so probably shouldn't have told him that in advance. But we'll give you two minutes of his remaining time. Thank you, Chief Judge Garland. I appreciate it. I'll make a very few number of points. Judge Pillard, you mentioned the, quote, unquote, vanishingly few number of high cost areas in states where they took the money. As we note in page 18 of our reply brief, in states like California and Texas, it's not vanishingly few. It's a substantial percentage of those areas. And as I say, they won't disappear just because the Phase 2 auction takes place because of those census blocks and also because of the extremely high cost blocks. You also asked my colleague on the other side about the interim period. Of course, interim periods need to end, and the agency has been saying to us that it will end shortly, maybe next year, maybe next year, in many different orders, including following our initial challenge to the 2014 order, when after it read our brief it said it asked the court to abate the case to issue another order in which it, again, didn't provide the support and now says only that it might. But that's the flip side of it. I mean, one of the things that the agency has been doing, as is its obligation to the law, is listening to objections and considering them and giving process. And so some of the time that's been passing is the time to really try to understand the basis of industry's objections. I take that point. To be fair. To be fair, Judge Pillard, but what the agency has not done in all that time, including receiving comments from us and taking the time to issue a second order, this is now its second chance. Your argument is not that the agency isn't acting in good faith. Your argument is this isn't an interim short period, and therefore if there were a theory about extra deference, it shouldn't apply. Correct, Judge Garland, including when you consider the fact that given their second chance to explain this, there still is no record evidence supporting them. When you alluded to the agency's burden, it's clear that the agency's burden, if it has to justify its decision with substantial evidence, is to point to at least some evidence. But it's hard to say that industry has really borne its burden. I mean, you point to some evidence of cost that AT&T proffered, but I take it that this is not just an AT&T challenge. This is U.S. Telecom and nationwide, and there's no data with respect to the cost of others to provide this service. Plus, as Judge Garland's questions with you made clear, there are some potential gaps in the coverage that haven't really been described. Their view is that they cannot comfortably assume that everyone gets service. If I may respond quickly, there in fact was broader evidence in the record. I mean, certainly AT&T presented evidence of representative states. U.S. Telecom presented evidence that 97 percent of the country is covered. The FCC itself said it has 98.5. But more to the point, what the FCC has done here is promulgated, or it failed to promulgate, leaving in place an extremely overbroad obligation that imposes on the carriers more than a billion and a half dollars in cost by the FCC. Now we're in the jury's summation. It's fine for you to just answer the judge, but leave it at that. We ask for a remand. Thank you. Thank you very much. All right, we'll take the case under submission.
judges: Garland, Pillard, Wilkins